IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COLONY INSURANCE COMPANY,    :
     :
     Plaintiff,    :
     :
     v.    :    CIVIL ACTION NO.
     :    1:05-CV-0707-JOF
THE COCA-COLA COMPANY,    :
     :
     Defendant.    :

## OPINION AND ORDER

This matter is before the court on Defendant's motion to exclude expert testimony of George Yeremian [73-1]; Defendant's motion for summary judgment [74-1]; Plaintiff's motion to preclude filing of reply brief [85-1]; and Plaintiff's motion to withdraw Elizabeth J. Campbell as attorney [117-1].

**I.    Background**

    **A.    Procedural History and Facts**

Plaintiff, Colony Insurance Company, filed suit against Defendant, The Coca-Cola Company, in a subrogation action to recover money paid by Colony to the Jade Palace III Chinese restaurant in Norcross, Georgia, after a fire destroyed the restaurant on October 27, 2003. Colony asserts claims of negligence, breach of warranty, and breach of bailment against Coca-Cola, alleging that the fire was caused by an electrical failure in the power supply

of a soda fountain dispenser owned by the Coca-Cola Company.   After discovery, Defendant filed the instant motion to exclude expert testimony and motion for summary judgment.

Defendant purchased the soda fountain at issue in this litigation from IMI Cornelius in March 1997.   The soda fountain was manufactured by IMI Cornelius.[1]  The soda fountain was originally leased to a restaurant in downtown Atlanta from 1997 through 2002.   When that restaurant went out of business, the soda dispenser was returned to Defendant.   The power supply at issue in this litigation was manufactured by Lancer Corporation sometime between 1994 and 2001.[2]  Lancer designs and manufactures power supplies as well as soda dispensers. Defendant and Lancer have jointly designed a number of components for soda dispensing equipment, but there is no plan or agreement between Defendant and Lancer for the development of power supplies.   A Marketing Equipment Specifications document produced by Defendant discusses various pieces of equipment germane to Defendant's business.   Part I of that document governs "General Requirements."   Section 8 discusses electrical and states:

> 8.1   Electric (including electronic) equipment must be capable of operating properly at 90 to 110 percent of its stated voltage without being damaged.

---

[1]Plaintiff disputes this statement of fact, arguing that Defendant can also be considered a manufacturer of the soda dispenser.  The court addresses the legal aspect of that argument below.  However, there is no dispute that the actual assembly of the product – the manufacture in its practical sense – was done by IMI Cornelius.

[2]Again, while there may be a question as to whether Defendant can be considered a legal manufacturer of the power supply, there is no dispute that it was actually assembled by the Lancer Corporation.

2

8.2    Electronic equipment must be suitable for the environment in the equipment in which it is expected to operate.

*See* Dooley Depo., Exh. 3, at 4.  Part III, Data Sheet A, discusses the Dispenser.  It has blanks under the electrical category for volts, frequency, amperes, power cord length, plug type, and valves (voltage, power transformer).  *See id.*, at 5.

A division of IMI Cornelius, IMI Equipco, is the exclusive re-manufacturer of all Defendant-owned soda fountains.  The soda dispenser in question was sent to IMI Equipco in April 2002 to be re-manufactured in preparation for installation at another location.  Defendant prepared the re-manufacturing procedures used by IMI Equipco, including those for the power supply.  Equipco uses only power supplies provided by Defendant in the re-manufacturing process.  During the re-manufacturing procedure, the soda dispenser was "paired" with a power supply produced by Lancer.  The power supply is a "standard part" that is interchangeable between soda dispensers manufactured by Cornelius and those manufactured by Lancer.  Lancer soda dispensers typically are shipped out with power supplies.

During the re-manufacture process, IMI Equipco takes a number of steps, including disassembly, cleaning, and re-graining of the equipment.  The re-manufacturing process is governed by a checklist for each specification in the process.  Defendant provides the procedures and specifications.  Specific steps are taken with respect to the power supply, including cleaning the transformer junction box and wires.  The power supply and transformer

3

are also checked for frayed wires and stripped insulation.  The power supply is tested with a volt meter.  After the process is completed, the equipment undergoes an electrical test.  At the end of the re-manufacturing process, the soda dispensing machine and power supply that ultimately were placed in the Jade Palace restaurant were operating properly.

In May 2002, Defendant leased the soda dispensing equipment to Jade Palace for no charge.  Jade Palace also did not pay Defendant a percentage of its soda sales.  Neither Jade Palace nor Defendant could locate a signed copy of the lease agreement, but both agree that the relationship was governed by a written lease.   NorthStar Beverage, a contractor of Defendant, installed the soda dispensing equipment, including the power supply, on May 29, 2002.   At times between installation and the date of the fire, NorthStar Beverages and the Austell Division of Coca-Cola Enterprises responded to service calls from the restaurant. One of those service calls involved a complaint that nothing was dispensing from the machine, and a technical representative assisted someone at the restaurant in plugging the power supply back in.

After the fire, Plaintiff hired A.W. Durham of Cunningham Investigative Services to investigate the origin and cause of the fire.   Mr. Durham determined that the fire originated in one of the service areas off the main dining room where the soda dispensing machine was kept and that there were likely combustible materials in the vicinity of the soda machine. Because he observed evidence of electrical activity, Mr. Durham decided to have George Yeremian, an electrical engineer, review the fire scene.

4

Mr. Yeremian works for EFI Global, Inc., a consulting firm in Norcross, Georgia. He has a degree in electrical engineering from Clemson University and has worked in a variety of capacities in the manufacturing and consulting fields. He is a professional licensed engineer. Mr. Yeremian has taken seminars which touch on the issue of power supplies and has used and maintained power supplies in his previous manufacturing jobs. He designed a power supply for a senior project in college. He has never worked in an expert capacity on a matter concerning power supplies. He has never worked with a Lancer power supply such as the one involved in this case. He has reviewed the Lancer documents and materials at Lancer's website but has not reviewed separate documentation on the performance or operation of power supplies. Mr. Yeremian began getting involved in fire investigation matters in 2002.

The fire at Jade Palace took place on October 27, 2003, and Mr. Yeremian made his first visit to the site on October 29, 2003. Mr. Yeremian next visited the site on November 4, 2003, when he began clearing debris and looking at portable appliances. On November 24, 2003, Mr. Yeremian made a preliminary report in which he accepted Mr. Durham's determination that the origin of the fire was in the service area off of one of the main dining rooms. In this preliminary report, Mr. Yeremian concluded that arcing occurred in certain appliances through a process of "series arcing" which occurs "when a conductor is connected and unconnected, connected and unconnected many times with a current going through that conductor. Every time you disconnect a conductor or a portion of it while a current is flowing

through it, they call it a parting arc.  A parting arc is formed which can lead to the physical manifestation of what we saw in Figure . . . 28."  *See* Yeremian Depo., at 105.   In his preliminary report, it was this "series arcing," Mr. Yeremian asserted, that was the source of the electrical failure.

After he filed the preliminary report, Mr. Yeremian conducted a laboratory examination of the subject power supply connected to the soda dispensing machine and an exemplar power supply from a soda dispensing machine in a different area of the restaurant that had not been destroyed by fire.  Mr. Yeremian also conducted a laboratory examination of the subject soda dispensing machine.

Mr. Yeremian compared the exemplar equipment from another service area in the restaurant that had not been destroyed by fire with the subject equipment in the service area affected by the fire.  He observed that arcing through char occurred due to an external attack by fire.  Mr. Yeremian defined the manner in which this happens:  Where there is a

> metallic outer covering for the cable . . . [t]hat should be grounded if it's installed correctly.  So when fire starts attacking the conduit or the cable whichever one you want to call it, it's more correctly called cable, the installation chars on the individual conductors inside the cable.  That charring forms carbon.  Carbon is a semiconductor material and then you can create a ground fault between the energized conductor and the grounded metal sheath of the cable.  And that will actually arc a hole in the cable.

*See* Yeremian Depo., at 78.   Mr. Yeremian visually inspected the receptacles in the service area room and found no evidence of failure in them.   Similarly, he noted no problems in the junction box on the service area.

6

He observed evidence of electrical activity on the tea brewing machine but determined this was not a cause of the fire but, rather, evidence of an attack on an energized cable. He also concluded that the carbonator from the soda dispensing machine, the soda dispenser, itself, the coffee maker, and the refrigerator had no evidence of electrical failure.

Upon laboratory inspection, Mr. Yeremian noted that on the power supply from the soda dispenser, the female portion of the receptacle had a blade from the male plug stuck into it. The metal at the tip of the male plug had been eroded away through either vaporization or melting. He also observed that 75% of the strands from the conductor wire inside the power supply had been severed by arcing.

Mr. Yeremian took no further action on the case file after the laboratory inspections in early 2004 until he began preparing for his expert deposition on November 30, 2005. Approximately one week before the deposition, Mr. Yeremian reviewed the records and photographs from the laboratory inspections. Based on the additional information gleaned from those inspections, Mr. Yeremian changed his opinion as to the cause of the electrical failure from that he submitted in his preliminary report from November 2003, which was completed after only visual inspection of the fire scene.

At his deposition, Mr. Yeremian theorized that the electrical failure was caused by a bad crimp connection on the inside of the receptacle of the power supply which resulted in a high resistance connection. The crimp in question is located in the female piece of the receptacle where brass covered metal is wrapped around the copper strands of the conductor

wire.  Mr. Yeremian testified that the melted mass of green metal seen in photographs of the subject power supply was the location of the bad crimp connection.  It is green because something oxidized the copper of the conductors.  The crimp is "bad" because it was not crimped tightly enough around the individual strands that compose the conductor.  This "looseness" enabled air gaps to circulate between the strands.  "When you have air gaps in between them and between it and the metal of the actual crimp, you can develop oxides.  Oxides do not have the same conductive properties as the copper.  They have a high electrical resistance."  *Id.* at 115.  "Resistance is an electrical property and it's defined as the resistance of an object to the flow of electrical current through a conductive object.  It furthermore generates heat depending upon the level of resistance and the current flowing through."  *Id*. at 114.

Mr. Yeremian testified that he believed the crimping problem would be a manufacturing problem and not a design problem.  Most likely it would result from the manufacturer using "the wrong tool or the wrong dye to make the crimp."  *Id.* at 110.  He did not have any design information on the Lancer power supply.  Defendant's counsel inquired:

> Q:    So do you have any evidence to support your belief that this was a manufacturing problem or defect in this power supply?
> A:    I have evidence in my opinion that a failure in a high-resistance connection failure occurred at that location inside that receptacle.
> Q:    All right.  And what is that from, that failure?
> A:    I believe it was from a high-resistance connection.
> Q:    Okay.   And the high-resistance connection is based on a manufacturing defect or a design defect or something else?

> A:    It is a high-resistance connection inside that crimp.   How it got there, the evidence is melted.

*Id.* at 110-11.   That is to say, Mr. Yeremian could not testify how the crimp in the subject power supply was fastened, tightened, or installed because it had been destroyed in the fire. He could not say whether the crimp in the subject power supply was too small, too big, or fastened too low or too high around the strands.   He cannot state with certainty whether the bad crimp resulted from the wrong tool or dye used in the manufacturing process.

Mr. Yeremian found no evidence of a high-resistance crimp in the exemplar power supply taken from the soda dispensing machine in the other service area.   He has never seen a bad crimp in a power supply device.   Mr. Yeremian, however, has read about bad crimp connections in The Ignition Handbook by Vytenis Babrauskas and a Consumer Products Safety Commission document measuring resistance across different types of crimp connections. Mr. Yeremian has not done any testing on the amount of resistance necessary to generate heat in a crimp connection, and he has not done any testing to gauge the strength of the crimp connection.   He did not attempt to recreate through computer simulation or other method the resistance he asserts happened in this instance.

Mr. Yeremian testified that after reviewing the laboratory inspection, he abandoned his prior theory that "series arcing" in the power supply was the electrical failure.   What he saw inside the power supply and the damage on the male plug causes him to believe that there was

9

a "small arc blast" inside the power supply resulting from a high-resistance connection at a crimp.

Mr. Yeremian has attended seminars and taught classes that deal with high-resistance connections that have created a fire.

> The most common that I've seen is connections at a receptacle either where the wire attaches on the side of it – and I'm talking about receptacles in houses now most commonly – where the wire attaches on the side underneath the screw terminal or a bad connection or high-resistance connection between a male blade of a plug and the female clamp inside of a spec grade residential receptacle.

*Id.* at 125.   Heat is generated with high-resistance.   When the high-resistance connection occurs and heat is generated, there are no sparks  or pieces of metal expelled from the power supply.[3]   Rather, Mr. Yeremian hypothesizes that the connection generates a localized area of high temperatures which carbonizes the plastic of the receptacle.   When the receptacle is carbonized, it becomes a semiconductive material.   "When that occurs between the energized conductor and any grounded metal near it, arcing will occur.   That will generate enough heat to char and burn the plastic body of that receptacle.   If it falls out of that receptacle and contacts combustible materials, a fire can ensue."   *Id.* at 143.   Mr. Yeremian did not find any

---

[3]In his second deposition, Mr. Yeremian appeared to take a different position with respect to the material expelled from the power supply.  There, he testified that the electrical fault "can also develop into an arc event that will expel smolder and pieces of charred plastic and pieces of molten metal from the outlet."  *Id.* at 213.  But he cannot know absolutely whether that occurred in this situation.  *Id.*

AO 72A
(Rev.8/82)

evidence of such melted plastic, however, because it would have been consumed in the fire. He cannot quantify at what temperature the plastic body of the outlet will begin to carbonize.

The tea brewing machine, the coffee maker, the refrigerator and the carbonator all probably contained crimp connections according to Mr. Yeremian.  He did not inspect the connections in those appliances in the lab.  Mr. Yeremian inspected the coffee maker and did not find any physical evidence that would suggest a high-resistance event in that appliance. There was no arcing in the coffee maker.  He excluded the tea brewing machine as the cause of the fire through visual observation of the arc severing in the circuitry and the appliance. The arcing followed the wiring which would indicate that the unit was plugged in but not operating.  That is, the electrical activity was going through to the switch but was not going through the switch to the other pieces of the appliance.  Mr. Yeremian located a piece of PVC piping with cord adhered to it.  The cord matched the output cord from the exemplar power supply and appeared to be the cord that attached to the soda dispenser to supply the dispenser with 24 volts.  Mr. Yeremian observed that the connectors in the soda dispenser appeared normal, and there was no evidence that the cord could have been the ignition point for the fire or that there were any short-circuiting or other problems in the dispenser.

Mr. Yeremian did find physical evidence of high resistance in the power supply of the soda dispenser.  Because the crimp location is now covered with molten metal, there is no way for Mr. Yeremian to determine what the status of the crimp connection was prior to the fire. There was other damage in the power supply, including an arc-severed steel strap which had

11

been grounded on the female clamp.   There was also arcing on the load side terminal of the transformer.   From this evidence, Mr. Yeremian concludes that there was violent arcing in the power supply.

He excluded the possibility of an overload to the power supply because the physical evidence in that situation would have shown consistent damage throughout the length of the conductors.   He also excluded the possibility of a poorly inserted plug into the receptacle because the tip of the male plug blade was fully inserted into the female receptacle and stuck in that position.   He found no physical evidence of abuse or misuse of the power supply.   He also eliminated the possibility that fire attacked the power supply externally.

> For the fire to attack it from the outside and cause that kind of damage, it would have to get past the cord that's attached to the plug that's plugged into the power supply.   It would have to get past the plug itself.   And then it would have to char the body of the receptacle enough to cause the arcing and inch inside the power supply enclosure.

*Id.* at 151.   Mr. Yeremian does not believe that is what happened, but he supposes that some of his peers could reach that conclusion.   *Id.* at 152.

Mr. Yeremian did not find any documents that referred to crimp connection in the power supply and did not see any design drawings reflecting crimp connections.   Since conducting the lab inspection in this case, Mr. Yeremian has not inspected crimp connections in any other power supplies.   He has not looked at any data or scientific studies relating to high-resistance activity or high-resistance crimp connections in power supplies.   He has no information on the history of the power supply used at the Jade Palace restaurant.   He has not

reviewed any Underwriters Laboratories, Inc., or National Fire Protection Association standards with respect to this power supply.

After his first deposition on November 30, 2005, Mr. Yeremian provided a supplemental expert report on December 2, 2005, in which he documented the conclusions he testified to in his first deposition. He also conducted a Burn Test on March 10, 2006, in which he attempted to recreate some of the circumstances surrounding the Jade Palace fire. Mr. Yeremian was then deposed again on April 5, 2006.

The purpose of the Burn Test was to replicate the testing done by Defendant's expert, Christopher Shiver. Mr. Yeremian, however, was not able to obtain the Lancer power supply receptacles used by Mr. Shiver so he used lamp holder adaptors manufactured by the same company which were also made of phenolic or plastic-like material. Phenolic chars under heat but does not melt. The Burn Test related only to the melting of the receptacles and whether the melting receptacle could ignite combustible material. It did not attempt to replicate any arcing events or generate any expelling or molten metal or charred plastic. Mr. Yeremian also did no testing to determine whether plastic or metal could escape through the vents or holes in the steel box holding the power supply.

In the testing, Mr. Yeremian touched the ignitor to the specimen for a short period of time until the specimen began to ignite. The specimen would burn into open flame for two to three seconds and then self-extinguish. The relevance of the Burn Test to the incident at Jade Palace was Mr. Yeremian's attempt to "replicate a flaming piece of plastic falling into

13

combustibles," so he used the ignitor to knock the specimen off of the holder and into the combustibles.   The Burn Test would show that such a scenario is possible, but Mr. Yeremian could not say for certain whether this is what happened at the Jade Palace.   In his test, Mr. Yeremian had combustibles (shredded paper towels) approximately ten inches below the clamp and ignitor, but he could not say how far away any combustibles would have been at the Jade Palace.   He was, however, relying on Mr. Durham's determination that it was likely that combustible materials were in the vicinity of the soda dispenser.   Mr. Yeremian did not test the specimen after the Burn Test but visually observed that it was severely charred.

### C.    Contentions

In its *Daubert* motion, Defendant contends that the court should not admit the testimony of George Yeremian because (1) he is not qualified to opine about power supplies; (2) his testimony does not meet the *Daubert* standards for reliability because they are not based on Mr. Yeremian's scientific or technical knowledge, but rather are based on his subjective beliefs; and (3) Mr. Yeremian's testimony is irrelevant because it does not assist the trier of fact in light of the fact that he "changed" his opinion.[4]   In response, Plaintiff avers that Mr. Yeremian is qualified to opine about power supplies both through his education and

---

[4]Plaintiff also filed a motion seeking that the court bar Defendant from filing a reply to its *Daubert* motion concerning Mr. Yeremian.   Plaintiff argues that Defendant's moving brief exceeded the court's page limitations by two pages, and therefore, Defendant should not be entitled to a reply brief.   The court disagrees and DENIES Plaintiff's motion to preclude filing of reply brief [85-1].

his prior work experience.   Plaintiff also contends that Mr. Yeremian used the methodology approved by the National Fire Protection Association and eliminated other possible sources of the fire.  Therefore, his opinion is reliable.

Defendant also filed a motion for summary judgment on Plaintiff's claims.   Defendant asserts it is entitled to summary judgment on Plaintiff's negligence and breach of warranty claims because there is no evidence of a defect in the soda fountain or the Lancer power supply.   Defendant also avers that it is not the "manufacturer" of the power supply and therefore cannot be held liable under theories of negligence or breach of implied warranty. Finally, Defendant avers that because the bailment arrangement between Defendant and the Jade Palace restaurant was gratuitous, Defendant cannot be held liable for any alleged defect in the power supply as it was not aware of any such defect.

Plaintiff responds that Defendant can be considered a "manufacturer" of the power supply because it had input into the design and manufacture of the power supply as well as its re-manufacture.    Plaintiff also asserts that Mr. Yeremian's testimony concerning the electrical failure in the power supply provides the basis for a jury determination that Defendant was negligent and breached its implied warranty.    Finally, Plaintiff avers that because Defendant benefitted from the lease of the soda dispensing machine in the form of increased Coca-Cola syrup sales, the bailment was not gratuitous and Defendant cannot escape liability based on its alleged ignorance of the defect in the power supply.

## II.    Discussion

15

**A.**    *Daubert*

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."   The United States Supreme Court has interpreted this statement to require district courts to become evidentiary gatekeepers, "ensuring that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

The Supreme Court recognized that the rule admits only "scientific knowledge" and not speculation or subjective belief.   Scientific knowledge derives only from the actual application of scientific methodology.[5]   In order to be considered reliable, proposed expert testimony must be supported on "good grounds."  *Id.* at 590.  The Supreme Court has provided four non-exhaustive factors to aid the trial court in determining reliability:   (1) Testability of the theory or technique; (2) whether or not there is a known or potential rate of error; (3) whether the theory or technique has been subjected to peer review; and (4) whether the theory has received general acceptance in the relevant community.   *Id.* at 593-94.   Ultimately,

---

[5]The Supreme Court has subsequently made clear that *Daubert*'s gate-keeping function applies not just to scientific but also to technical or other specialized knowledge. *See Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

however, the reliability inquiry must be tied to the particular facts of the case. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal citations omitted).

Equally important to the gatekeeping function is a determination of whether the proposed testimony is relevant. *Daubert*, 509 U.S. at 591. Relevant testimony is that testimony that "logically advances a material aspect" of a party's case. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). In other words, an expert's testimony should help the trier of fact decide the case at bar. Thus, an expert's testimony may only be admitted into evidence if (1) the expert is qualified to testify competently about the matters he is to discuss; (2) the methodology supporting his conclusions is sufficiently reliable; and (3) the expert testimony is relevant and helps the trier of fact to understand the evidence or determine a fact in issue. *Id.* at 1309. *See also McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Neither *Daubert* nor its progeny preclude experience-based testimony, *see Kuhmo Tire*, 526 U.S. at 151, nor do they prohibit trained experts from forming conclusions by extrapolating from existing data. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). An expert's opinion testimony becomes inadmissible, however, where it is connected to existing data only by the ipse dixit of the expert. *Joiner*, 522 U.S. at 146.

1.    <u>Qualifications</u>

Defendant contends that Mr. Yeremian has no familiarity with Lancer power supply systems and has no previous experience with designing or manufacturing power supplies other than work on his senior paper in college. Defendant also avers that Mr. Yeremian did not

17

consult any studies or documents concerning the performance or operation of power supplies in this case.  Similarly, Defendant avers that Mr. Yeremian has no particular expertise in crimp connections.

Plaintiff responds that the power supply Mr. Yeremian built in college was more complicated that the simple Lancer power supply at issue here.  Plaintiff further asserts that Mr. Yeremian worked regularly with power supplies in his previous manufacturing employment, and while as a consultant, he has analyzed fires where power supplies have had to be eliminated as a possible ignition source.  He has also attended continuing education seminars which have touched upon power supplies.  Plaintiff further asserts that Mr. Yeremian did not have to do any further research on crimps because he had an example of the Lancer power supply crimp connection in the form of the exemplar Lancer power supply from the other side of the restaurant.

Rule 702 provides that a witness must be qualified by "knowledge, skill, experience, training, or education."  *Id.*  As noted by Plaintiff, Mr. Yeremian has worked with power supplies throughout his manufacturing work experience and while a consultant on causes of fires.  While it is true that Mr. Yeremian made no particular effort to familiarize himself with the Lancer power supply at issue here, Defendant has made no argument that the power supply at issue here is unique in any way that would cause Mr. Yeremian's past experience to be unhelpful to the instant situation.  As such, the court determines that Mr. Yeremian is qualified to offer his opinion as to the electrical failure.

18

2.      Testimony

Defendant first argues that Mr. Yeremian's testimony is unreliable because he changed his theory of the fire one week before his deposition.   Defendant contends that this change in opinion was "generated in anticipation of his deposition in this litigation."   *See* Motion, at 18. Defendant then asserts that Mr. Yeremian has simply conceptualized possibilities of what could have happened in the fire.   *Id.* at 20.   However, he could not testify as to the state of the crimp connection prior to the fire or in what manner the connection was "bad."   Defendant further points out that Mr. Yeremian admitted that any evidence of the high resistance connection would have been destroyed in the fire.   Defendant complains that Mr. Yeremian did not inspect the crimp connections in the other electrical appliances in the service room where the fire occurred and also did not see any evidence of a bad crimp connection in the exemplar power supply.   He also did not do any testing on the amount of resistance that would be necessary to generate heat at the crimp connection.   Mr. Yeremian did not review any design drawings of the crimp connection or any documentation concerning the connection. Finally, even if one accepts that a bad crimp connection existed, Defendant contends that Mr. Yeremian cannot establish that as the cause of the fire in this instance.   Mr. Yeremian was not able to quantify the amount of heat necessary to carbonize the plastic body of the outlet in the power supply.

Plaintiff responds that fire cases often depend on circumstantial evidence and reasonable inferences because there will be no direct evidence of causation due to the

19

destructive properties of the fire.   It also asserts that Mr. Yeremian followed the scientific method set forth in the National Fire Protection Association's "Guide for Fire and Explosion Investigations," NFPA 921.   Under this methodology, the investigator gathers data, analyzes the data, develops a hypothesis, and tests the hypothesis.   If the hypothesis is not consistent with the data, it is discarded and a new hypothesis is developed.   Mr. Yeremian, Plaintiff argues, was not required to test his crimp connection and high-resistance event theory because they are well-accepted electrical principles discussed in basic handbooks.   Plaintiff also contends that Mr. Yeremian's testimony is reliable because he used the same methodology as Defendant's expert.

As an initial matter, the court notes that it is no defense against a *Daubert* motion to argue that your expert uses the same methodology as the opposing party's expert.   That is not the standard for the admission of expert testimony, and it is obvious why such an analysis would abdicate the court's gatekeeper responsibilities.   The court also notes that although Plaintiff refers to the testimony of Defendant's experts, Chris Shiver and I.J. Kranats, Plaintiff has not filed any *Daubert* motions with respect to them, and therefore the court does not address at this time the sufficiency of their testimony.[6]

---

[6]Plaintiff also refers to the testimony of Clem T. Robertson, a fire investigator, to shore up the conclusions of Mr. Yeremian.   Mr. Robertson, however, was never previously identified as an expert witness in this case, and the court will not consider any aspect of his testimony to rebut Defendant's *Daubert* motion.

The court next notes that there is nothing particularly suspicious about the manner in which Mr. Yeremian "changed" his expert opinion.   The court finds credible Mr. Yeremian's explanation that his preliminary report was given prior to his laboratory examination of the appliances found in the service area.   During the laboratory examination, Mr. Yeremian had additional documentation of the physical evidence through photography but apparently did no more thinking about the issue until he reviewed his file in preparation for the deposition. There is no evidence that anyone suggested to Mr. Yeremian that he take another look at his preliminary report.   Rather, it seems that in his experience as a consultant, Mr. Yeremian documents the physical evidence at the time of the incident but may not spend additional analytical time with that evidence until asked to do so.   The court understands the economic reasoning behind Mr. Yeremian's behavior.   The court need not rule at this time whether Mr. Yeremian's change in testimony is something that could be pursued on cross examination in front of a jury or whether it would impact the credibility of his testimony.   Rather, the court rules now that the fact that he has "changed" his opinion does not preclude his testimony altogether.

Based on his testimony, Mr. Yeremian did follow the scientific methodology outlined for the investigation of fires.   NFPA 921 sets forth a six-step process that a fire origin and cause investigator must use:  (1) Recognize the need to determine what caused the fire, (2) define the problem, (3) collect data, (4) analyze the data (inductive reasoning), (5) develop a hypothesis based on that data, and (6) test the hypothesis (deductive reasoning).   Defendant

21

has offered no evidence to show that there is any doubt that this methodology is accepted in the relevant scientific community.

Further, Mr. Yeremian did give extensive testimony on the manner in which he "ruled out" other sources of the fire. He explained his physical examination of the tea brewing machine, the coffee maker, the carbonator, and the soda dispensing machine. He also explained why the physical damage to the power supply shows that it was the source of the fire as opposed to reflecting damage caused by a fire that started elsewhere. That is, if the fire had started elsewhere and come to the power supply, the energy source to the power supply would have been compromised, and no arcing would have occurred within the power supply itself. In this sense, Mr. Yeremian has attempted to falsify his opinion as to the location where the fire started.

The court, however, finds that Mr. Yeremian's testimony that he believed the crimp problem likely occurred during manufacturing with an improperly-sized tool is pure speculation. Mr. Yeremian could testify that he believed there was a high-resistance connection in the crimp, but he could not be more specific because the evidence had melted in the heat of the fire. Thus, as the court described above, Mr. Yeremian could not testify how the crimp in the subject power supply was fastened, tightened, or installed. He could not say whether the crimp in the subject power supply was too small, too big, or fastened too low or too high around the strands. He could not state with certainty whether the bad crimp resulted

22

from the wrong tool or dye used in the manufacturing process.  He also could not specify whether the crimp was placed too high or too low on the wires.

Because Mr. Yeremian could only offer speculation on this point, the court finds that he can testify to his belief that the fire started inside the power supply and that there is severe damage at the location of the crimp connection, but he cannot testify as to his speculation as to how that poor crimp connection came about.  Therefore, the court GRANTS IN PART AND DENIES IN PART Defendant's motion to exclude expert testimony.  Because of the court's legal rulings below, the court need not address other possible deficiencies in Mr. Yeremian's testimony.

**B.      Motion for Summary Judgment**

1.      <u>Negligence and Breach of Implied Warranty</u>

Defendant argues that it cannot be liable for negligence or breach of implied warranty because it is not the "manufacturer" of the power supply under Georgia law.   Defendant contends that the only evidence in the case shows that Lancer was the manufacturer for the power supply and that there was no agreement or plan between Defendant and Lancer to develop the power supply in question.   Defendant also argues that there is no evidence that Defendant provided Lancer with specifications for the power supply.   Further, Defendant asserts that it took reasonable care and the power supply was without any latent defect so that Defendant cannot be held liable for negligence.   Defendant contends that the re-manufacturing process contained sufficient quality control procedures to detect and eliminate defects.   With

respect to the breach of implied warranty claim, Defendant contends that Plaintiff cannot show the power supply was defective when sold.

Plaintiff responds that Defendant is a "manufacturer" under Georgia law because Defendant had "input" into the soda fountain's design, manufacturing, and assembly at three levels: (1) original development and manufacture, (2) re-manufacture, and (3) assembly at the restaurant. Plaintiff contends that the testimony of Mr. Yeremian is sufficient evidence from which a jury could conclude that Defendant was negligent in permitting a faulty power supply to be installed at the Jade Palace restaurant. Mr. Yeremian's testimony, Plaintiff contends, also is evidence which shows that the problems with the power supply occurred at the manufacturing stage and therefore were present when the power supply was installed, thus satisfying the elements of breach of implied warranty.[7]

Plaintiff primarily relies on *Nelson v. CM City*, 218 Ga. App. 850 (1995), *rev'd in part on other grounds*, 267 Ga. 390 (1996), *further explained in*, 229 Ga. App. 141 (1997), for its argument that Defendant can be considered a "manufacturer." Nelson, however, is a

---

[7]Because there is no evidence of a written lease between Jade Palace and Defendant, Plaintiff argues that Article 2A of the Georgia Uniform Commercial Code applies to the equipment, and thus Defendant impliedly warranted that the soda dispensing equipment was "merchantable." The relevance of this argument is not immediately clear to the court. The record does not reflect that there is no evidence of the existence of a written lease. Rather, the restaurant owner and Defendant appear to agree that papers were signed. They simply cannot be located now. In any event, Plaintiff does not explain why the application of Article 2A would render any different analysis. It appears to the court that "merchantable" is the applicable standard regardless of which statutory provision is applied.

strict liability case and involves the application of O.C.G.A. § 51-1-11.1 to distinctions between a "product seller" and a "manufacturer."   Here, Plaintiff has brought a negligence action, not a strict liability claim.   The court finds it is inapposite to graft the definition of "manufacturer" in the strict liability statute on to a negligence cause of action.   Rather, the court finds more pertinent guidance in Georgia negligence cases, particularly *Home Insurance Company v. Caterpillar, Inc.*, 202 Ga. App. 522 (1992).

In *Caterpillar*, insurers filed suit against Caterpillar, the manufacturer of a front end loader.   While the loader was being used on a construction project, it sustained damage when a fire started in the engine compartment.   The insurance company retained an expert who testified that the fire probably started in the "wiring harness as a result of an inherent defect in the loader, to wit: insulation failure.   He also concluded that the location of the wiring harness was well inside the loader and was not within an area that would have been serviceable by the operator of the loader.   But he could offer no opinion as to the cause of the defect." *Id.* at 524.

> In rejecting the insurance company's negligence action, the court held:
>
> > In our view, [the expert's] conclusions establish the existence of an inherent defect in the loader, nothing more.   They do not demonstrate that the defect was the result of any negligence on the part of defendant Caterpillar.   A defect in a machine can arise for any number of reasons.   This is not a case of "clear and palpable" negligence.   The mere fact that the loader had an "inherent defect" does not demonstrate negligence on the part of defendant Caterpillar.
> >    Relying upon *Firestone Tire & Rubber Co. v. King*, plaintiffs argue they do not need to demonstrate how the defect occurred.   Plaintiffs' reliance upon *Firestone* is misplaced.   That was a strict liability case, not a negligence case.

> If we were to apply *Firestone* in a negligence case, we would be doing away with the need to prove negligence. That we cannot do.

*Id.*

The court finds *Caterpillar* controlling here. Mr. Yeremian can testify that he believes the origins of the fire to be in the power supply of the soda dispensing machine. However, even if the court assumes arguendo that Defendant can be considered a manufacturer of the power supply, under *Caterpillar*, the mere fact that there may have been some defect in the power supply is not sufficient evidence to sustain a negligence claim against Defendant. Therefore, the court GRANTS Defendant's motion for summary judgment as to negligence.

In Georgia, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." O.C.G.A. § 11-2-314. To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." *See* O.C.G.A. § 11-2-314(c); *see also* O.C.G.A. § 11-2A-212(c) ("fit for the ordinary purposes for which goods of that type are used"). A plaintiff must demonstrate, however, that the product was defective at the time it was sold or leased. *See*, *e.g.*, *Simpson v. Hyundai Motor America, Inc.*, 269 Ga. App. 199, 204-05 (2004). Thus, proof that the product was "defective *when sold* is an essential element" of a breach of implied warranty claim. *Id.* (emphasis in original).

Because the court has determined that Mr. Yeremian's opinion that the defect in the bad crimp connection was the result of a manufacturing problem must be excluded as pure speculation, Plaintiff has proffered no evidence in the record from which a jury could conclude that the defect existed when the power supply left the Lancer manufacturing facility or even after it was re-manufactured at the Equipco facilities.   Thus, Plaintiff cannot sustain a claim for breach of implied warranty.   The court GRANTS Defendant's motion for summary judgment on that claim.

2.    Breach of Bailment

Defendant argues that the relationship between Defendant and Jade Palace was one of "gratuitous bailment," and therefore Plaintiff cannot succeed on its breach of bailment claim. Under gratuitous bailment, Defendant argues, Plaintiff must show not only that there was a defect in the soda dispensing equipment, but also that the defect existed before the soda fountain was delivered to Jade Palace, and that Defendant was aware of the defect and did not inform Jade Palace.

Plaintiff responds that when equipment is leased, it cannot constitute gratuitous bailment.   Because Jade Palace understood that it was obligated to purchase syrup from Coca-Cola, the restaurant knew it was paying for the soda dispensing equipment through the purchase of Coca-Cola syrup.[8]   Plaintiff avers that under Georgia bailment law, a defendant

---

[8]As a point in fact, Mr. Bui, the owner of Jade Palace, did not testify that he believed that he paid for the equipment through the purchase of the syrup.  *See* Bui Depo., at 65.

27

is strictly liable for "secret faults."   Plaintiff contends that the bad crimp in the power supply

constitutes such a "secret fault."

Defendant is correct that a different standard of care applies when a bailment is

determined to be gratuitous.

> Where a bailment is purely gratuitous, and created for the exclusive benefit of
> the bailee, as where articles are loaned to another simply for his own use,
> without any reward or compensation being received from him by the lender, the
> bailor's only duty in respect of defects is to inform the bailee of any of which
> he is aware and which might make the use of the subject of the loan perilous to
> the bailee or to his servants.

*Howell v. Amerson*, 116 Ga. App. 211, 212 (1967).

In a bailment for hire, however, a higher standard of care is imposed on the bailor.  The

bailor warrants that the "thing bailed is free from any secret fault rendering it unfitted for the

purposes for which it is hired.'"   *See Southeastern Air Service v. Cromwell*, 88 Ga. App. 820,

823 (1953) (quoting predecessor to O.C.G.A. § 44-12-63).  The provision of the Code is a

> statutory declaration that due care on the part of the bailor requires him to
> examine the thing bailed, for the purpose of seeing that it has no hidden defects
> which would render it unsuitable for the purpose for which it was hired.  What
> would be ordinary care depends upon the particular business in hand, the
> circumstances surrounding the particular transaction, and the situation of the
> parties.

*Id.* (quoting *Parker v. G.O. Loving & Co.*, 13 Ga. App. 284, 286 (1913)).  *See also Hall v.*

*Skate Escape, Ltd.*, 171 Ga. App. 178, 178-79 (1984) ("a bailor warrants the soundness,

_____

Rather, he testified that one of the requirements of the lease for no charge was that he buy
syrup from Defendant to dispense in the soda fountain.  *Id.*

suitability, and fitness of a bailed product for the intended use, and is liable for any injury or damage which results from a latent defect of which the bailee has no knowledge and the consequences of which he could not avoid through the exercise of ordinary care").

Here, if the bailment was gratuitous, there is no dispute that Defendant would be entitled to summary judgment on this claim because there is no evidence in the record to show that Defendant was aware of any alleged problem with the power supply at the time it was installed at the Jade Palace restaurant. Thus, the question on Defendant's motion for summary judgment is whether the bailment was for hire or was gratuitous.

> In determining whether a bailment is gratuitous or one for hire, "the possibility of some undisclosed benefit is not enough to render the bailment one for hire; there must be an understanding or arrangement, express or implied, between the parties, whereby the bailee has received or has a right to expect and demand something for his benefit. Casual or incidental benefits which he would have to surrender at the will of the bailor, do not amount to consideration. There must be a compensation of some sort actually contemplated in the contract or bargained away by the bailor."

See *Prince v. Atlanta Coca-Cola Bottling Co.*, 210 Ga. App. 108, 111 (1993) (quoting *Merchants National Bank of Savannah v. Guilmartin*, 88 Ga. 797, 804-05 (1892)).

Georgia courts have analyzed the notion of "consideration" when determining whether a bailment is for hire or gratuitous. For example, in *Butler v. Shirah*, 154 Ga. App. 111 (1980), the court considered a situation where neighboring farmers loaned one another tractors for use. The court held that "the most that may be inferred is that the farms involved in such transactions have a motive in lending their equipment, this motive being the hope that

29

their neighbors will reciprocate when needed.   Such a motive, however, is not consideration."
*Id.* at 112.   Because the court found no consideration, the court determined the bailment was
gratuitous.   In contrast, in *Meriwether County v. Creamer*, 146 Ga. App. 651 (1978),
Meriwether County loaned a fire truck to the Cove Community civil defense unit for use
during the unit's fund-raising auction.   During a drive of the truck through the community, the
truck flipped over, killing the plaintiffs' mother.   The court declared that the bailment was not
gratuitous because "the use of the truck . . . was for the benefit of the county to develop civil
defense units including the Cove Community civil defense unit."   *Id.* at 655.    Finally, in
*Prince*, a customer filed a negligence action against the Atlanta Coca-Cola Bottling Company
when she slipped in a puddle of water that leaked from the defendant's special events wagon
provided to a Phar-Mor store for promotional purposes.    The evidence before the court
showed that Coca-Cola provided the wagon to Phar-Mor at Phar-Mor's request.   The defendant
did not charge Phar-Mor for the use of the wagon.   Phar-Mor paid only for the setup of the
wagon and the products that Phar-Mor sold from the wagon.   Under those circumstances, the
court concluded that the bailment was gratuitous.

Here, Defendant leases the soda dispensing equipment at no cost to the restaurant
because the restaurant then purchases Coca-Cola syrup for use in the equipment.   The fact that
the syrup is purchased through a third-party vendor does not lessen the benefit of the sale to
Defendant, as Defendant Coca-Cola is the sole supplier of Coca-Cola syrup.   Similarly, the
fact that the Jade Palace restaurant did not pay to Defendant any percentage of its soda sales

does not change the fact that Defendant benefitted in the form of increased syrup sales from soda dispensed at Jade Palace.   Thus, the court finds that this situation is more akin to *Creamer* than *Butler*, where the benefits of good-neighborliness are less tangible, or *Prince*, where a one-time loan of a bottling truck was not expected to lead to a stream of purchases of syrup.   Accordingly, the court DENIES Defendant's motion for summary judgment as to Plaintiff's breach of bailment claim.

**III.    Conclusion**

The court GRANTS IN PART AND DENIES IN PART Defendant's motion to exclude expert testimony of George Yeremian [73-1]; GRANTS IN PART AND DENIES IN PART Defendant's motion for summary judgment [74-1]; DENIES Plaintiff's motion to preclude filing of reply brief [85-1]; and GRANTS Plaintiff's motion to withdraw Elizabeth J. Campbell as attorney [117-1].

The parties are DIRECTED to file a pretrial order on Plaintiff's breach of bailment claim within thirty (30) days of the filing date of this order.


**IT IS SO ORDERED** this 16th day of January 2007.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE


31